FILED
IN CLERK'S OFFICE

2006 JUN 12 P 3: 11

U.S. DISTRICT
DISTRICT OF

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | DOCKET NO. 4:05-CR-40034 |
| | ) | |
| NICHOLAS POLICE | ) | |

**DEFENDANT'S MEMORANDUM ON SENTENCING**

Nicholas Police ("the Defendant"), through Counsel, submits the following
Memorandum on Sentencing for this Honorable Court's consideration at the time of disposition
upon his conviction.

**Facts.**

On February 10, 2006, the Defendant pleaded guilty to three counts of an Indictment
charging him with possession with intent to distribute, and distribution of, Marijuana (one count)
and possession with intent to distribute, and distribution of, cocaine (two counts).[1] The offense

---

[1]  All in violation of 21 U.S.C. §841(a)(1).

conduct which led to the Indictment was straightforward enough.  Investigating Agents, through the use of an informer, negotiated three controlled purchases of scheduled substances from the Defendant, all in the month of March, 2004, and all at the Defendant's residence, 45 Sagamore Road in Worcester, Massachusetts.

The Defendant is currently serving a three-to-five year Massachusetts prison term as the result of a conviction for cocaine trafficking.[2]  The sentence was imposed May 21, 2004, and his projected release date will be May 10, 2009.  Under Chapter 4 of the Guidelines, the Defendant's Criminal History Category was fixed at II.

With a total offense level of 19,[3] the Defendant's presumptive Guidelines sentencing range is 33 to 41 months.

The Defendant, but for the one State conviction and the single Federal conviction, has no history of crime or suspected criminal conduct.  He comes from a decent family, with a good upbringing; aware of his troubles, his family remains staunchly supportive of him.

From an early age -- approximately seven -- the Defendant has demonstrated an uninterrupted industry and enterprise in things to which a typically decent young man might be drawn.  Various sports, for example, which began for him in youth leagues and continued on through High School and College.  He graduated from Wachusett Regional High School and went on to complete his education with a B.A. from Assumption College in Worcester.  He was also gainfully employed throughout College at a number of different jobs, broadening his perspective on life.[4]

---

[2]  The weight of the drug was in the statutory area of between fourteen and twenty-eight grams.  There were two other counts to the State Indictment.  On a charge of possession with intent to distribute a Class D drug, the Defendant was ordered to serve a two year house of correction-type sentence, concurrent with the five year prison term.  On a conspiracy count, the Defendant was ordered to serve a probationary term of 4 years, including conditions of drug and alcohol evaluation and treatment.  Upon the understanding of Counsel, the probationary period was to begin after the house of correction sentence expired.

[3]  The Probation Department factored in a three point downward adjustment for "acceptance of responsibility."

[4]  The specific details of the Defendant's historical activities are contained in "Exhibit 1," annexed hereto and made a part hereof.

After College, the Defendant – who had always expressed an interest in music – began a company called "Crown Loyal Records," out of Worcester, Massachusetts. This would have been in May of 2001.

At some point, about a year after he was on his own in business, he took an inexplicable interest in the sale of a modest amount of cocaine. Upon information and belief, this was a one-time involvement – up until that time – and not a means from which he drew a regular livelihood. Although buyers of such contraband may arguably be characterized as "victims," they were willing participants in transactions which – from their point of view – yielded substances for recreational use. This of course did not hold for the informer who was set up to make the three controlled purchases from the Defendant.

It is Counsel's understanding that such endeavors were interdicted in their incipience, they did not flourish. Nor were they accompanied, at *any* time, with even the slightest suggestion of violence on the part of the Defendant, let alone actual violence itself. But for the scheduled substance offenses, the Defendant has been tainted by no other criminal transgressions at all.

Unfortunately for the Defendant he reacquainted himself with commerce in scheduled substances on the ill-conceived basis that he would be going to prison in any event, that his fate was sealed. It was highly uncharacteristic – aberrant -- that this young man permitted an otherwise exemplary, decent and moral way of life to suffer, at his own hand, by the fact of his unlawful conduct.

### Argument.

#### 1. *Booker.*

As this Court knows, under the case of United States v. Booker, 543 U.S. 220, 125 S.Ct. 738 (2005), application of the Sentencing Guidelines is no longer mandatory with the Court; although the Court must take the Guidelines into account, they are nonetheless advisory only. Hence, the sentencing Court has virtually complete discretion in implementing them -- or not

implementing them at the disposition of a case.

Some Courts have taken this as license to *exceed* – for the same offense conduct – a pre-Booker Guidelines sentence. Other Courts, after consideration of the principles of 18 U.S.C. §3553, have seen fit to undercut the Guidelines, sometimes substantially, in pursuit of rational sentences.

"Booker's remedial solution makes it possible for courts to impose non-guidelines sentences that override the guidelines, subject only to the ultimate requirement of reasonableness." United States v. Jimenez-Beltre, 440 F.3d 514 (1st Cir. , March 9, 2006).[5]

The Defendant will be seeking a reasonable sentence.

### 2. **The Guidelines Calculus**.

According to the Presentence Report, as mentioned above, the Defendant has a total offense level of 19, and a Criminal History Category of II. Hence, his presumptive Guidelines sentencing range is 33 to 41 months.

### 3. **U.S.S.G. Section 5K1.1**.

There was no plea agreement in this matter.

The Defendant, however, volunteered his cooperation to the DEA not only in terms of his own activities, but those of others as well.[6] Apparently, the DEA did not confer great status on the assistance of the Defendant and the Government therefore has not represented that it would file a downward departure motion under §5K1.1 of the Sentencing Guidelines.

It is the Defendant's position that in view of the Defendant's cooperation, the Government ought to file such a motion. The Defendant asserts that his cooperation with the

---

[5] To the defense' knowledge, official reporter pagination is not yet available.

[6] The Defendant also voluntarily forfeited $17,500. Two expensive watches and a quantity of jewelry.

Government has been completely truthful and detailed.  He has offered all he was able to offer, and he is certainly not to blame if the Government chose not to make use of his intelligence.

While the Government is not specifically bound to make such a filing by any ordinance or plea consideration, the Defendant contends that there exists an arguable obligation for it to do so.

> [W]hen the government enters into a plea
> agreement with a defendant, it *must* undertake
> the obligations, *including discretionary obligations*,
> that it imposes upon itself.  The plea agreement is
> analogized to a contract, Santobello v. New York,
> 404 U.S. 257, 262, 92 S.Ct. 495 (1971), and
> defendants may seek to compel performance, see
> United States v. Saxena, 229 F,3d 1, 6 (1st Cir. 2000)
> ('A defendant who has entered into a plea agreement
> with the government, and himself fulfills that
> agreement, is entitled to the benefit of his bargain.');
> United States v. Gonzalez-Sanchez, 825 F.2d 572,
> 578 (1st Cir. 1987).

United States v. Davis, 247 F.3d 322, 325 (1st Cir. 2001), emphasis supplied.

In fact, where a defendant has in good faith provided information to the Government, a refusal to file a 5K1.1 motion may vex the Due Process Clause of the Constitution.  See, *e.g.*, United States v. Conway, 81 F.3d 15 (1st Cir. 1996).


### 4. 18 U.S.C. §3553.

In the aftermath of Booker, 18 U.S.C. §3553 has, appropriately, taken on far more significance than that invested in it before.[7]  That is, "individualized" sentencing is more the mandate than is "sentencing by the numbers."

> [A] court's explanation of its sentence [and, *a priori*,
> the sentence itself must 'sufficiently show a thoughtful

---

[7]  The Booker Court "excised" from §3553 that portion of it which required the Courts to follow the Guidelines at sentencing.

> exercise of the court's sentencing responsibility and a
> degree of care and individualized attention appropriate
> to the solemnity of the sentencing task.' United States v.
> Vazquez-Molina, 389 F.3d 54, 59 (1st Cir. 2004), <u>cert.
> granted, judgement vacated, and case remanded on other
> grounds</u>, 125 S.Ct. 1713 (2005).

<u>Jimenez-Beltre</u>, at 440 F.3d —.  Consideration of a defendant himself or herself – apart from the

Guidelines – was, then, a mandatory factor *before* <u>Booker</u> liberated the Courts from hide-bound

adherence to the Guidelines and before §3553 was restructured to eliminate the necessity for

such adherence.

    The <u>Jimenez-Beltre</u> Court,[8] quoting at some length from <u>Booker</u>, went on to give further

meaning to the conceptual -- and operational -- factors inherent in post-<u>Booker</u> sentencing:

> Many commentators argue that by giving the guidelines
> controlling weight and abdicating the responsibility to
> take account of the other section 3553(a) factors, courts
> "effectively mak[e] the guidelines as binding as they were
> before *Booker*," thereby violating *Booker's* constitutional
> command.  Mccolgin & Switzer, supra. At 53; *see also*
> Frank O. Bowman, III, *Beyond Band-Aids:  A Proposal for
> Reconfiguring Federal Sentencing After Booker,* 2005      .
> U. Chi. Legal F. 149, 183 (2005).  Justice Stevens made
> a similar point in his dissent in *Booker,* stating that the
> "sentencing range is now nothing more than a
> suggestion that may or may not be persuasive to a judge
> when weighed against the numerous other considerations
> listed in [section 3553(a) ]." 243 *[sic]* U.S. at 300, 37 S.Ct.
> 273 (Stevens, J., dissenting in part).  Justice Scalia wrote
> to the same effect, stating that "*logic compels the
> conclusion that the sentencing judge, after considering the
> recited factors (including the Guidelines), has full
> discretion, as full as what he possessed before the Act was
> passed, to sentence anywhere within the statutory range.
> If the majority thought otherwise ... its opinion would surely
> say so.*" *Id.* at 305, 37 S.Ct. 273 (Scalia, J., dissenting in
> part).  To be sure, these are dissents to the remedial
> decision in *Booker,* which does not elaborate on its

---

[8]  <u>Jimenez-Beltre</u> is as comprehensive a decision on post-<u>Booker</u> sentencing as the First Circuit has handed down, in the opinion of the defense.

statement that the guidelines must be "consider[ed]" post-*Booker*. But given the close divisions on the Court about the post-*Booker* role of the guidelines, and given the new composition of the Court, it would be foolhardy to ignore the constitutional dangers of adopting an approach to the guidelines post-*Booker* that approximates, in a new guise, the mandatory guidelines.

At 440 F.3d ―, emphasis supplied.  There is no ambiguity whatever to this language; there is nowhere a clearer directive on the meaning of Booker and the adherence to the principles of the "new and improved" §3553.  Sentencing Courts are once again with the authority to take into account at sentencing factors which the Guidelines had previously discouraged or, worse, prohibited altogether.

Under 18 U.S.C. §3553, the Court is obliged to "... impose a sentence sufficient, but not greater than that necessary to comply with the purposes set forth in paragraph 2 of this subsection."  Also, it is incumbent upon a Court to set a "reasonable"[9] sentence, taking into account the factors recited in §3553, one of which is

"To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."[§3553(a)(2)(D).]  To impose a sentence of greater length than which is reasonable unto the day, however, would be simply to "warehouse" the present Defendant, and permit of the "institutionalization" which befalls many long-term prisoners.  If such became the case with the Defendant, the purposes of the section would be ultimately defeated.

The Defendant knows that this Court will sentencing him in reflection of the seriousness of the offense.  In terms of deterrence, he will be barred from exposure to the public for the length of his incarceration.  And, even with his lightly taken assistance to the Government, he may have caused the deterrence of others with whom he associated or of whom he had knowledge.  Perhaps others yet to introduce themselves to criminal conduct, will -- by knowing

---

[9]   See, for example, United States v. Webb, 403 F.3d 373, 383 (6th Cir. 2005).

of the Defendant's penalties -- receive the message and be dissuaded from transgression. A prison sentence will obviously protect the public from damage at the Defendant's hands. Demonstrably, in light of his willingness to assist the Government and in light of the opinions of those who have authored letters in his behalf (*infra*), the Defendant has already begun the process of rehabilitation. Since the present offenses -- the Defendant thinks of them as part of a pattern which began with his State offenses and terminated upon the present charges – are completely anomalous to his life as a whole, and since he will be monitored by *two* sovereigns after his release, and since he has strong role models in his family and in the community to turn to, his risk of post-release recidivism is low. By virtue of a prison sentence alone, retribution for the Defendant's crimes will be exacted and satisfied. The traditional philosophies of sentencing will be served by a "reasonable" sentence.

What is "reasonable?" This is a somewhat difficult question to answer owing to the nature of the offense circumstances, and given the sentencing discretion vested in this Court in the aftermath of Booker. The Defendant as a man presents certain compelling features – care with the affections of others, dedication to his friends and family, human decency, to name a few. Because he was not vigilant to his own conduct, and to the consequences caused his family, friends and the community by his own acts, he failed those qualities. Yet in the end, those same qualities will endure over his temporary commerce with a forbidden world, and will be his salvation, will guide him through his sentence and to the end of making amends to those who love and respect him.

As it stands, the Defendant is in the midst of serving a State prison sentence within the Commonwealth; he has two years to his credit on that sentence. The present conduct occurred after the original State conduct, but prior to the initiation of his State sentence. He assigns that his Federal conduct was part of the same pattern of conduct for which he was penalized by the Commonwealth. That is not to say that asks this Court to forgive him any term of imprisonment, but it is to say that part of the Defendant's life is over.

Once again, because the Guidelines are advisory, this Court may, upon its reason,

sentence anywhere below the Guidelines range which, in this case, in 33 to 41 months.

Defense Counsel has taken careful, at length consideration of all the information available to him; has taken into account his experience in sentencing matters and the particulars of the instant case; and has conducted an analysis of the various sentencing possibilities which may be considered in this case.

The Defendant respectfully suggests to this Court that it consider sentencing him at the lower end of a Guidelines range of 27 to 33 months. Further, the Defendant asks that any sentence imposed by this Court be directed to run *concurrent* with his existing State Sentence. The Defendant understands that if he is discharged from his State Sentence early – he is eligible for release in May of 2007, the terminus of the lower end of the sentence – his Federal sentence will exceed it under the circumstances he proposes.

This Court is authorized under the Guidelines, §5G1.3, to order -- *inter alia* -- that a Federal sentence run concurrent to a State sentence. The facts of this matter fit squarely within such authority. Under §5G1.3(b), for example, where a defendant is serving an existing sentence and the conduct from the offense underlying that sentence has been taken into account as "relevant conduct" in the calculus of a second sentence, the second sentence is to be served concurrent to the first. While the facts in this case are not *strictly* in accord with the language of the Guideline Section, they are of the same spirit. That is, the instant Defendant's State conduct was not used to boost his total offense level score, but – under Chapter Four of the Guidelines – his criminal history score from the State conviction exposes him to a greater sentence in *this* Court. Therefore, the Defendant ought to be a candidate for concurrent sentencing under this particular Section.

Section 5GT1.3(c), ("Police Statement"), also empowers this Court to run a Federal sentence concurrent to an undischarged term of imprisonment. See United States v. Brown, 232 F.3d 44 (2d Cir. 2000), *certiorari* denied, 532 U.S. 913, 121 S.Ct. 1245; United States v. Brannon, 277 F.Supp.2d. 667 (E.D. Wis. 2005). The Court may even depart downward to "fit" a Federal sentence along with a State sentence. United States v. Martinez-Salazar, 318 F.Supp.2d

667 (S.D. N.Y. 2004). In Application Note 3 of this Section of the Guidelines, a sentencing Court should consider, among other things, the factors in 18 U.S.C. §3584, which make incorporative reference to those contained in §3553(a), treated above.

The Defendant also asks this Court to consider to credit him with "time served," if it should find such consideration to apply.

### 5. The Letters in Support of the Defendant.

Certain persons of good standing in the community, who are fully aware of the Defendant's State prison sentence and the conviction in the present case, have nonetheless been gracious – courageous – enough to take a public stand in his behalf. With the following Exhibit numbers, those people are:

"Exhibit 2:" Mr. David Police;

"Exhibit 3:" Ms. Paula Police;

"Exhibit 4:" Ms. Debbi Schur and Mr. Timothy Schur;

"Exhibit 5:" Ms. Beth Sannella;

"Exhibit 6:" Ms. Marilee Rauh;

"Exhibit 7:" Mr. Tim Bishop; and

"Exhibit 8:" Ms. Kimberly Chronchio.

Exhibits 2 and 3 come from the Father and Mother of the Defendant. While they are loving, and heartbroken, parents, they offer productive insights into the Defendant. Both of these people use the word "greed," and believe that avarice was the primary reason for his sojourn in the world of drugs. These letters reflect an intelligence which requires their authors to be truthful, make some harsh declarations about their Son. Mr. & Ms. Police are under no illusions about the Defendant's conduct and do not misplace the responsibility for his conduct, although they certainly cannot explain the present anomaly. Yet they know that fundamentally the Defendant is a decent human being, with a sense of moral rectitude. They also have an abiding conviction, free from willful blindness, that when the Defendant's legal travails have ceased he

will "reclaim his honor." The Defendant is fortunate indeed that with such parents he will have the opportunity, encouragement and support in doing so.

Exhibit 4 is a letter from the Schurs, the Defendant's Aunt and Uncle. They have been close to the Defendant since his birth, and, despite the emotional hardship the Defendant has wrought on his family, praise his many virtues. They too see the unvarnished seriousness of his conduct but are heartened, in their ongoing contact with him, that he has already begun to profit from his errors. This speaks to a dedicated start at rehabilitation.

Ms. Beth Sannella [Exhibit 5], a friend of the Police family, and who has known the Defendant all his life, speaks of being "confused" at the Defendant's offense conduct. "Confused," because it was drastically out of character. Ms. Sannella has maintained a close allegiance with the Defendant since he has been incarcerated, and also believes that he has both acknowledged his criminal failings and begun a time of reformation.

Ms. Rauh and Mr. Bishop [Exhibits 6 and 7], both of a long affiliation with the Defendant, have also found the courage to go on record in support of a young man who, perforce his guilty plea, has publicly declared himself a criminal.

Ms. Cronchio [Exhibit 8] is a contemporary of the Defendant who has known him since they met at Assumption College in 1999. As a Casualty Adjuster with a major insurance firm, she has certainly had occasion to deal with differing accounts of the same event. She would have the training and ability to extract the "spin" from a set of circumstances and see them for what they are. She has seen the Defendant many times in a prison environment and, nonetheless, perceives his elemental decency.

None of these people has been willfully blind toward the Defendant and his conduct. They are all of unquestionable standing in the community. Their record support of the Defendant must require a certain measure of conviction in a society which has increasingly favored harsher methods in dealing with its offenders. Yet they come forward willingly, in aid of a man who has earned -- perhaps justifiably -- not only a likely prison sentence, but the disdain of a society at large. The Court is asked to hear the voices in his behalf.

### 6. Conclusion.

Mr. Police knows that this Court will sentence him in reflection of the seriousness of the offense. This Court has heard the evidence concerning his conduct. He acknowledges the impact of his conviction. Even so, he hopes the Court will also recognize his intrinsic worth. He has learned and accepted with humility that he is not above the community or the law, but merely a part. He is far from being beyond salvage.

Although he recognizes the gravity of his offense conduct, the Defendant nevertheless asks this Honorable Court to temper justice with mercy. That quality, in this day of "law and order," seems to have been sidelined, if not altogether abandoned. But the law has always recognized the "discretion to be compassionate or harsh is *inherent* in the sentencing scheme." Garner v. Jones, 529 U.S. 244, 258 (2000), emphasis supplied. "[W]e see in the sentencer's expression of mercy a distinctive feature of our society that we deeply value." California v. Brown, 479 U.S. 538. 562, 107 S.Ct. 837 (1987) [dissenting Opinion of Justices Powell and Stevens].

This Court *can* exercise compassion, mercy, toward the Defendant without abdicating its responsibility to society. Indeed, as the letters on behalf of the Defendant demonstrate, there are voices in the very society the law seeks to protect which speak for the Defendant and ask for compassion.

The Defendant, even in light of his offense conduct, is not a man who is below the mercy and compassion of this Court. He asks the humanity of this Court.

THEREFORE, for the reasons advanced herein, for reasons to be adduced at the sentencing hearing, and for such other reasons as this Court may find in the interests of justice, the Defendant asks of this Court:

1. To urge the Government to file a 5K1.1 Motion, with a recommendation of a downward departure at least to a base offense level of 17 -- without a change in the Defendant's

Criminal History Category -- and to downward depart in accordance therewith;

2. In the alternative, the Defendant asks this Court, under its own authority, to downward depart to a base level of 17, without a change in the Defendant's Criminal History Category;

4. Since the Defendant has exhibited no violence or inclinations to violence, to recommend that be considered for a minimum security placement with the Bureau of Prisons, a placement which provides programs suitable to the Defendant's corrective needs;

5. To order that such sentence as this Court may order be served concurrent with the State Sentence the Defendant is now serving; and

6. To order that the Defendant be credited with time served on the present sentence, if such factor is applicable.

***ORAL ARGUMENT IS REQUESTED.***

Respectfully Submitted,

NICHOLAS POLICE, Defendant,
By his Counsel:

_____
THOMAS F. McEVILLY
McEvilly & Curley
48 West Street, Suite 1
Leominster, Massachusetts   01453-5694
(978) 534-3556 [Telephone]
(978) 534-5119 [Facsimile]

DATED: